Cases number 1, 2, 6, 1, 9, and 7, Williams v. CSX Corporate Transportation, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 40, 41, 42, 43, 44, 45, 46, 47, And I know that this court has had occasion to review Ms. Williams' charge of discrimination and intake form on prior occasion. It's important to note in this case a few undisputed facts. One is that there was pornography in the workplace. And two, CSX has a zero tolerance policy with respect to pornography and other forms of harassment. The legal issue I think before us, and I know that Judge Cole and Judge Seiler have written extensively in prior decisions Brown v. City of Cleveland, Young v. Daimler Chrysler, and also a leading Sixth Circuit case of Dixon v. Ashcroft. These very important cases distinguish between claims, oftentimes retaliation claims that are not brought up in the administrative process, and the issue is whether those retaliation claims are within the scope or the expected scope had the EEOC done an investigation. What's important here in the present case is that we're not even within a claim. Specifically we're talking about a hostile work environment case based on sex. And the only varying elements are whether they could impute the company through supervisor actions or through co-workers or through both. I think that there's a legitimate factual dispute as to whether Mr. Wingo, the primary actor, is in fact a supervisor. I position that he's not a supervisor. We at various times have argued that he was acting as a supervisor, at least in some capacity. I think the facts, at least according to Mr. Wingo, are pretty clear. He is a yardmaster. Oftentimes he is on the property without the benefit of a trainmaster, his supervisor. So in that sense he is the top person at a lot of times. However, he does not have the ability to hire, fire, terminate people. And in fact he's a union member. But some railroads have yardmasters that are union members and some do not. In this case, his testimony is that he's a member of the union. But either way, with respect to those issues go to the merits, perhaps for the judge, but I think a jury to determine whether this is a co-worker, supervisor or harassment. Is that a factual question or a legal question? I believe it's a factual question because of the way that the jury instruction would be issued. And we debated this in the trial court level, but we didn't get to it because the hostile work environment case had been kicked out, so it never reached the merits. I think there are enough varying facts, and of course the Supreme Court has issued a decision that I don't think in any way deals with administrative exhaustion, but it does define a supervisor in the Ball State case. Does the Supreme Court say it's a factual question? I believe they do. I think that in the Ball case they focus on the ability to affect employment decisions. That clearly would involve hiring and firing, which Mr. Ringo did not, but I think it's an open question with respect to scheduling and organizing and supervising the workflow. But going back to the district court's decision, and this is on page 6 of document 175, this instances of exposure to pornography can be best categorized as co-employee harassment. I don't think that's accurate because the facts establish that the supervisors, whether that's Mr. Ringo or the trainmasters, Mr. Ed Anderson, were aware of the pornography. There was a pornography locker. It was in open spaces on tables. And in the context back in 2004 when these facts arose, Ms. Williams was the only woman and the only African American at that time to work at this small train depot in Brewston, Tennessee. So I think the context is important here, which is Ms. Williams was very excited coming into this job, a well-paying job, and arrives in an area that the pornography had flourished for some time. And the supervisors were aware of this and did not take action. So in that sense it doesn't matter whether it's a co-worker or a supervisor harassment case because I think they merged together. The co-workers may have put it there, but the supervisors were aware of it and failed to take action. Is there any indication in the record that any of this, the presence of the pornography, was directed at Mrs. Williams in any way? Or is it simply, maybe it's not so simply, but it's just that it's out, visible, and under the argument, I guess, sanctioned or reprimanded by CSX. There is testimony from her that it was directed at her in the sense that it was intentionally laid out on tables in the break room and one of her jobs as the clerk was to clean up trash and other things in the urinals of that nature. So she felt that at times it was purposely laid out to embarrass her as opposed to the locker which was sometimes open, sometimes closed, but there was a plethora of pornography there. Okay, and that was her testimony, her belief in essence, but was there any other evidence that would indicate that the pornography was directed at her other than her sense that it was laid out, at least arguably, by others for her to see and embarrass her? I think other than it being laid out on the tables, no. For instance, she did feel that the manure made on the walls, knowing that she had to clean it, was intentional and there was some written comments that she felt were directed toward her specifically. Was this pornography put out on a daily basis or just one time or several times or how often was it done? Well, the locker was certainly on a daily basis. There was a dedicated locker in the break room that housed the pornography. I assume the locker was a closed locker or something. Not always. Testimony is that it was oftentimes open, but I may not have tabled it. When she saw this on the table, did she see it every day? I think my testimony is on a regular basis. I would not feel comfortable telling her that I think the testimony is every single day because there's traffic going through there and the evidence even from Mr. Wingo was that the trainman would take the pornography with them en route at times as well, keeping it with their grip. So I think that it was on a regular basis, but I cannot state for certainty that it was on an absolute daily basis. Going back to the issue of, I'm not aware of any circuit court opinion and certainly not from the Sixth Circuit that parses this fine of an evidence to require a pro se plaintiff walking into the doors of the EEOC or perhaps on a telephone call as often happens when people call in to talk to an EEOC investigator to be this specific to outline modes of proof, elements of proof that would go to a cause of action. So I think to that extent, the district court improperly relied upon the Rawson case, an unpublished Middle District of Tennessee case for that proposition and part of the relief that we would seek is to put an end to that because we know that the Sixth Circuit has written about liberal interpretations for pro se plaintiffs, particularly at the administrative level for different claims, but again this is not in our view a different claim at all. The EEOC charge as this court found before, which encompasses the intake form, specifically states a quote, very hostile work environment. So we believe that the combination of that language, again pro se, with the appropriate boxes being checked for sex, sufficiently satisfy the administrative exhaustion requirements. While it's true that at the time she filed this charge of discrimination, there had been what Mr. Wingo described as a completely out of hand event that was a singular event, at least lasting over a day or two, concerning the Republican National Convention and numerous remarks that were highly offensive, and the elimination of her job, but two months later, those were understandably the primary things on her mind when she went to the EEOC, the loss of that job now requiring her to commute from Brewston to Nashville, which she continues to do until today, were the primary issues. But the hostile work environment was certainly at issue and certainly written in this pro se back in 2004. Unless there are any questions, I feel I've covered the important points and while my gut tells me to sit down, I know you have a long day, so thank you. Thank you. Mr. Paul. May it please the Court, Mary Taylor Gallagher, on behalf of CSX Transportation, and let me start by apologizing, I'm afraid I've lost my voice at a very inopportune time. There are two issues before this Court today, and this is, as Mr. Paul noted, the second time this Court has had the opportunity to review this case. First, the District Court properly determined that Ms. Williams did not exhaust a claim that unknown trainmen harassed her by bringing pornography to work, and the Court based its opinion on the fact that the allegations in both of Ms. Williams' EEOC filings were limited to acts committed by one person, and that was Mr. Wingo. Ms. Williams specifically identified Mr. Wingo as the yardmaster and as an individual in management who harassed her. The Court found that, construed in the light most favorably to Ms. Williams, neither of her EEOC filings alleged exposure to pornography, and neither of her filings alleged harassment by anyone other than Mr. Wingo, and the question is whether an EEOC investigation into an allegation that an incident that Ms. Williams described in detail as occurring on September 2, 2004 would have led the EEOC to investigate pornography allegedly brought in by unknown trainmen. There is no allegation by Ms. Williams in the record that Mr. Wingo was responsible for bringing in the pornography, and in fact to date it is still unknown trainmen. By way of background, the facility where Ms. Williams worked in Brewston is a small depot. It's located on the main line between Nashville and Memphis. It's essentially basically a two-room building. It's two stories. The room below is a crew room where the trainmen such as the conductors and the engineers report to work to either board their train to go to Memphis or they return from Memphis, get off their train and go to their homes. There's also a bathroom downstairs. Upstairs there is a main room where the yardmaster, who would be Mr. Wingo, works, where the clerks such as Ms. Williams work, and where there's a small office where the trainmaster who oversees the entire subdivision maintains his office. When Ms. Williams went to the EEOC on November 18, 2004, she went to complain because her position, a clerk position, in Brewston had been eliminated, and she believed that was done in part because of an incident that occurred on September 2, 2004, with Mr. Wingo, where comments were made that this court found were based on race and sex. When this issue was previously before the court, the district court had granted CSX's motion for summary judgment, finding that Ms. Williams did not exhaust a claim for a hostile work environment. In looking at that issue, this court looked at Ms. Williams' charge information form and also her charge of discrimination. In looking at the charge information form, the court noted that based on the statute 29 CFR section 1601.12, Ms. Williams' charge information form contained information concerning a sexually hostile work environment that was sufficiently precise to identify the parties and to describe generally the actions or practices complained of. The court went on to note that Ms. Williams satisfied this requirement because she identified CSXT and its employee, Jeff Wingo, as the offenders. The court noted that in the course of three pages, Ms. Williams recounted the Wingo incident in detail. Her charge information form contained three handwritten pages, single-spaced, where she recounted in great detail exactly what was said during this conversation that occurred on September 2nd of 2004. The court went on to note that the charge of discrimination listed the earliest date of discrimination as September 2nd, 2004, the date when Wingo allegedly made the sexually hostile statements to Ms. Williams. So there is no doubt based on this court's prior finding that Ms. Williams exhausted a claim that Mr. Wingo made statements to her in the September 2nd, 2004 incident that made a claim for a hostile work environment. What Ms. Williams now wants to argue is that unknown train men, the individuals who reported to work at the Briston Depot to either board their train or returned from Memphis to the Briston Depot brought in pornography. That is a claim that involves different individuals and different conduct than what she went to the EEOC about in two separate filings complaining in detail about what we've referred to as the Wingo incident that occurred on September 2nd, 2004. Would that have any relevance to having a sexually hostile work environment? You don't think so? The Wingo incident, Your Honor? Yes. What about the pornography? The pornography, it's because the test is whether an investigation into the allegations she made to the EEOC, would that investigation or would the pornography be reasonably expected to go out of that investigation? And in this case where Ms. Williams went to the EEOC and said, Mr. Wingo, someone who she believed to be in management and who even in a pilot's brief to this court on page 16 continues to call Ms. Wingo her supervisor, she went and said, this individual in management harassed me. The earliest date this happened was September 2nd, 2004 when Mr. Wingo allegedly made these comments. As the district court correctly noted, the first time Ms. Williams ever mentions pornography is in her complaint to the district court. Neither of the EEOC filings, particularly the charge information form that was very detailed contained any allegation of a wrongdoer other than Mr. Wingo and by Ms. Wingo's own admission both at trial and in her summary judgment filings, there was no allegation that Mr. Wingo was responsible for the pornography or that he brought it to the workplace. To date, the individuals are still unknown trained men who are in a different class of employment from Mr. Wingo. You admit Mr. Wingo was her supervisor? Your Honor, based on the recent Supreme Court decision in Vance v. Ball State, Mr. Wingo was not a supervisor. Now granted, we have argued that point both to the district court and to this court on our prior trip here that Mr. Wingo was not a supervisor. By his own admission, he did not have the ability to hire or fire or direct employment actions. Is that a legal question or a factual question? Your Honor, I believe that's a legal question to determine and once it gets to a jury, the question is for the purposes of vicarious liability, which standard do you apply? Do you apply the supervisor standard where the employer can be vicariously liable for conduct by the supervisor or do you apply the negligence standard where if it's a co-worker and the employer is made aware of the conduct but does not take action to correct it? I don't believe though that that decision has any import as to the question of whether Ms. Williams exhausted a claim at the EEOC of whether unknown trainmen brought pornography to the workplace. If we're looking specifically at the question of whether vicarious liability can attach, then I believe based on the recent Supreme Court decision, Mr. Wingo is not a supervisor. But the question is, when Ms. Williams went to the EEOC in 2004, what did she report? Ms. Williams believed Mr. Wingo to be in management. She described him, or the charge of discrimination specifically identifies him as a yardmaster, which is a different type or different class of employment from a trainman, your conductors or your engineers. And in her detailed description of the incident, she said, Mr. Wingo, who is in management, is the individual who has harassed me. So the question is, what would the EEOC have investigated? And the EEOC would have gone and investigated a claim that Ms. Williams was harassed by someone who was in management. And then the question becomes, would that investigation be reasonably expected to uncover allegations of pornography brought to the workplace by unidentified trainmen, when that was never part of the charge of discrimination or the charge information form? The first time that issue appears in this case is in Ms. Williams' complaint to the district court. What is your view if, just hypothetically, we concluded that the evidence of pornography being around the workplace, that the district court heard by not considering it, I guess. And that, I guess, under that theory, that the charge that Ms. Williams brought of a hostile work environment on a continuing basis, we brought enough to consider this evidence. Where does that leave us? We would still look, Your Honor, to Ms. Williams' charge of discrimination form and the charge information form, where she identifies the first date that alleged discrimination took place as being September 2, 2004, and the latest date as being November of 2004, which is when she went to the EEOC. And we would look at that time frame and whether the acts identified in the charge would reasonably relate to conduct that occurred outside of the time frame. There's no allegation that Mr. Wingo brought pornography to the workplace. In fact, Ms. Williams' complaint with regard to pornography states that she complained to a train master who was not identified in the charge of discrimination. That train master stated that, well, we work with immature people. Your Honor, looking at the trial transcript, the testimony in the record is that that train master would have been Mr. Ed Anderson, who was Ms. Williams' train master from the time she started work in April of 2002 up until about June of 2004. That period of time occurred before the September 2, 2004 date, which Ms. Williams states as the first date discrimination took place. So we would submit that any allegation of pornography occurred before Ms. Williams went to the EEOC saying that, starting on September 2, 2004, I've been subjected to a hostile work environment. There's no allegation that Mr. Wingo had any involvement in that or that it occurred during that period of time. Going beyond the pornography in the District Court's determination that Ms. Williams did not exhaust a claim that unknown training brought pornography to the workplace, we're left with the same predicate acts that the panel of this Court previously determined were not sufficiently severe or pervasive to constitute a hostile work environment based on race. We're left with the comments made by Mr. Wingo during this discreet incident, September 2, 2004, that either occurred on one day or spilled into a second day. Either way, the panel of this Court previously determined that these were, while objectionable and while certainly not appropriate for the workplace, they were mere offensive utterances that were not sufficiently severe or pervasive. And the District Court correctly determined that because this Court had already held that the race-based comments made by Wingo in the same incident were not sufficiently severe or pervasive, that the sex-based comments made in the same conversation, likewise, did not create a jury question as to whether CSXT exposed Ms. Williams to a sexually hostile work environment. This case, at its outset, was about the elimination of Ms. Williams' position at CSXT. The District Court granted a summary judgment on that issue, and that issue was never brought before this Court. The claim then kind of became more of a claim of a racially hostile work environment, and then some instances of retaliation, which the Court also granted judgment as a matter of law during the course of trial. So we're left with the September 2, 2004 incident, and whether the comments made by Mr. Wingo based on sex were sufficient. One other point to note, in her brief, Ms. Williams wants to argue a bit about cleaning requirements that this Court has previously found were racially neutral, and the District Court found there was no evidence that, either direct or otherwise, that these cleaning requirements were given to Ms. Williams based on her sex. They reported for job duties to just note that, although that's discussed in the appellant's brief, that is something that this Court has previously found was not part of the racially hostile work environment claim, and likewise it's not part of the sexually hostile work environment claim. I'm happy to address any further questions from the Court. Thank you very much, Ms. Gallagher. Mr. Paul, you have rebuttal. First, I'd just like to note that, with respect to the dates on the charge of discrimination form, that the box continuing action is checked, which directly extends that latest date. Obviously, the latest date, identified as November 9, 2004, was around about the time that she went to the EEOC, but it's clear that these events were ongoing, at least as this form was completed at the administrative level. Second, looking at the charge intake form, Ms. Williams did identify two co-workers under question 11, this is just the EEOC's form, please list below any persons, witnesses, fellow employees, supervisors, or others, and she identifies Gary Nance and Tony Garcia as witnesses. So had a trained EEOC investigator had the time, budget, means to perform an investigation, it's likely that they would have contacted these two witnesses, and perhaps other co-workers, as we did in discovery, and found out that the pornography was widespread, and that there were many witnesses to this fact. Third, while ultimately the cases, as outlined in our reply brief, go to the totality of the circumstances, which is the test in a hostile work environment at page 4, we identify the cases that talk about that totality of the circumstances. So again, this parsing between co-workers and supervisors just doesn't really carry the day in terms of an adjudication, either procedurally or on the merits, it's important to look at both supervisor and conduct. The case, specifically, out of the Eastern District of Tennessee that we cited, Avery v. Idle Air Technologies, while an unpublished case, speaks directly to pornography being displayed in the workplace, even if not directed to one individual specifically. And again, that's consistent with the totality of the circumstances test on the merits. But similarly, we would ask that that be considered, because in this process that's meant to be informal, and oftentimes people go to the EEOC without representation, to have to be essentially lawyered up on these claims and come in with almost an exhibit book ready to go, seems to be the direction that at least the trial court here is leaning. And obviously that's a concern not just from Ms. Williams, but a concern for the entire intent of the statutes to take pornography out of the workplace, to prohibit discrimination and to make sure that the workplace is free from that. So it's not just about Ms. Williams, it's also about other pro se plaintiffs, or pro se claimants, later plaintiffs, who go to the EEOC. And therefore we ask that the court issue an important decision on this matter. Thank you very much. Okay, well thank you Mr. Powell and Ms. Gallagher for your arguments today.